UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

KEVIN R. LEWIS, JR.,

                          Petitioner,          **No. 1:13-cv-00933-MAT**
                                               **DECISION AND ORDER**

          -vs-

HAROLD D. GRAHAM, Superintendent,

                          Respondent.

_____


I.   **Introduction**

     Pro se petitioner Kevin R. Lewis, Jr. ("Petitioner") filed an
amended petition for a writ of habeas corpus pursuant to 28 U.S.C.
§ 2254 on February 15, 2018. In the amended petition, Petitioner
challenges his detention in Respondent's custody pursuant to a
January 4, 2008 judgment entered in Monroe County Court of New York
State (Keenan, J.), convicting him, following two separate jury
trials, of Murder in the Second Degree (New York Penal Law ("P.L.")
§ 125.25(1)), Attempted Murder in the Second Degree (P.L.
§§ 110.00/125.25(1)), two counts of Robbery in the First Degree
(P.L. §§ 160.15(1), (2)), two counts of Assault in the First Degree
(P.L. §§ 120.10(1), (4)), two counts of Burglary in the First
Degree (P.L. § 140.30(1), (2)), two counts of Criminal Possession
of a Weapon in the Second Degree (P.L. § 265.03(1)(b)), and two
counts of Criminal Possession of a Weapon in the Third Degree (P.L.

§ 265.02(4)). Petitioner is currently serving an aggregate prison term of 65 years to life.

## II.  Factual Background and Procedural History

### A.  The July 7, 2006 Home Invasion

In July of 2006, Deanna Durden ("Durden") lived with her two-month-old baby at an apartment on Marlborough Road in the City of Rochester. Durden, who had recently won the lottery, had $9,500 in the apartment. She also had some small bags of marijuana in the apartment for her personal use. On the morning of July 7th, Durden awoke to the doorbell ringing. When she looked out the door, she observed a man wearing what appeared to be a Rochester Gas and Electric uniform and holding a binder. Thinking the man was from the electric company, Durden cracked the door open to tell him to go to the back of the residence where the meters were located. Instead, the man pushed the door open, hitting her infant in the head.

Once inside, the man pointed the gun at Durden, asked if anyone else was in the home, and pushed her and her baby onto the couch. Another male then entered the residence; Durden recognized the second man as someone she knew from her childhood. The second man went upstairs, while the gunman kept the weapon trained on Durden and her baby, repeatedly asking her "Where is the shit?" and instructing her, "Just pray. Just pray." Durden attempted to grab the gun out of his hands and a struggle ensued. The gunman then

pistol-whipped Durden, fired two shots into her face, and fled the scene.

Durden was able to contact 911 and was taken to the hospital, where she has underwent several surgaries and suffered permanent nerve damage to her face.

Durden later identified Petitioner as the gunman. The man whom Durden recognized from her childhood was identified as Gerard Singleton ("Singleton"). Testifying for the prosecution pursuant to a plea agreement, Singleton described in detail the preparation and planning in which he and Petitioner engaged with regard to the robbery of Durden's home, including conducting reconnaissance and purchasing a uniform for Petitioner to wear to help him gain entry to Durden's residence.

**B.    The August 17, 2006 Murder**

On August 17, 2006, at about 9:00 p.m., Lashunda Robertson ("Robertson") was hanging out at her residence on Dewey Avenue in the City of Rochester smoking a "blunt" and a cigarette. Robertson, Petitioner's girlfriend, had spent the earlier part of the evening with him and Singleton, his accomplice from the Durden home invasion.

While Robertson was consuming her blunt, Leroy Buggs ("Buggs"), also known as "Life," rode by on his bicycle and attempted to kiss Robertson. After she rebuffed his advances, Buggs snatched the pack of cigarettes out of her lap and removed a "dime-

bag of weed" and a "nickel-bag of weed" from it. Upset that Buggs had stolen her marijuana and was being disrespectful to her, Robertson called Petitioner several times to ask him to come over and sit with her. When she finally reached Petitioner and related what had happened, he replied that he would be there in a minute. Meanwhile, Robertson's friend and neighbor, Nikkole Lewis ("Nikkole"), had come over to spend time with her.

As promised, Petitioner shortly arrived on the scene. Robertson stated, "Yo, that's him," referring to Buggs. Petitioner walked up to Buggs, then fired several shots from a revolver at Buggs at close range, striking him in the chest and stomach. Robertson and Nikkole both observed the shooting. Petitioner, Robertson, and Nikkole left the scene and went back to Robertson's apartment.

Buggs was still alive when the police arrived on the scene, but later succumbed to his injuries.

Back at Robertson's apartment, Petitioner wiped fingerprints from the revolver and wiped the shell casings, which he placed in an Altoids® box and dropped in a crevice in a wall of Robertson's apartment building. Robertson and Nikkole were both present and observed him doing this.

A crime scene technician from the Rochester Police Department ("RPD") recovered an Altoids® tin secreted within a crawl space at

Robertson's house. In the tin were three shell casings that were free of any fingerprints.

Petitioner stayed at Robertson's apartment overnight. The next day he traded the revolver with which he had shot Buggs for a vehicle. Petitioner told Nikkole not to say anything about what she had seen.

After Petitioner was arrested, he had an opportunity to speak with Robertson. During the conversation, Petitioner told her that "he didn't want to go to jail for 25 to life."

Prior to trial, the Monroe County Court severed the counts related to the Buggs murder from the counts related to the Durden robbery and shooting. The first trial began on November 26, 2007. On November 29, 2007, a jury returned a verdict convicting Petitioner on all counts related to the Durden shooting.

The second trial began on December 10, 2007. On December 13, 2007, a separate jury convicted Petitioner on all of the remaining counts. On January 4, 2008, Petitioner was sentenced to an aggregate prison term of 25 years to life on the Buggs murder and weapons-related counts, to be served consecutively to an aggregate prison term of 40 years, plus 5 years of post-release supervision, on the counts related to the Durden robbery and shooting.

The Appellate Division, Fourth Department, of New York State Supreme Court unanimously affirmed the judgment of conviction, and the New York Court of Appeals denied leave to appeal. People v.

Lewis, 93 A.D.3d 1264 (4th Dep't), lv. denied, 19 N.Y.3d 963 (2012).

Petitioner filed a pro se motion to vacate the conviction pursuant to New York Criminal Procedure Law ("C.P.L.") § 440.10, which was denied without a hearing.

In his timely filed amended petition, Petitioner asserts the following grounds for relief: (1) his statement to the police concerning the Buggs murder was coerced by police threats to arrest Robertson and place her child in foster care; (2) the identification evidence admitted at the Buggs murder trial should have been suppressed because the photo arrays were unduly suggestive; (3) the prosecution failed to comply with their discovery obligations by withholding the statement that Buggs made to a police officer; (4) Petitioner was denied his right to testify before the grand jury; (5) the sentence was excessive and vindictive; (6) the prosecutor improperly waived a preliminary hearing; (7) trial counsel at both trials was ineffective because counsel failed to (a) present an expert witness at the attempted murder/robbery trial; (b) retrieve one of two buccal swabs for independent testing for the attempted murder/robbery trial; (c) call an expert in victim identification testimony to challenge Durden's identification of him; (d) present an alibi defense at the Buggs murder trial despite telling the jury that he would present

one during opening statements; and (e) offer into evidence
Robertson's recantation statement.

Respondent filed an answer and memorandum of law in opposition
to the amended petition. Petitioner filed a reply.

## III. Discussion

### A.   Ground One: Failure to Suppress Petitioner's Coerced Statement to Police

Petitioner reprises his claim, raised on direct appeal, that
his statement to the police was induced by allegedly coercive
tactics.

At a pre-trial suppression hearing, RPD Investigator John
Conner ("Conner") testified that on October 6, 2006, at
approximately 10:34 p.m., he advised Petitioner of his <u>Miranda</u>
rights. Petitioner indicated that he understood his rights and,
when asked if he agreed to speak with Conner, Petitioner replied,
"uh-huh." When asked to clarify, Petitioner said, "I want to hear
what you've got to say." Petitioner provided no statements to
Conner in connection with the Durden shooting.

Petitioner remained in continuous police custody. Before he
was booked in connection with the Durden shooting, he also was
questioned by RPD Investigator William Lawler ("Lawler") at
approximately 1:47 a.m., on October 7, 2006, in connection with the
Buggs homicide. Lawler did not re-administer <u>Miranda</u> warnings. He
informed Petitioner that the police "had two eyewitnesses, a
deposition from his girlfriend, Licente [sic] Robertson, and a VHS

tape from the library across the street that showed the shooting."
In reality, there was no videotape of the shooting.

Lawler told Petitioner that Robertson might get "wrapped up in
this because she made a phone call and she's got two kids." Lawler
commented that he thought Petitioner was a good person who cared
for Robertson and her kids. Lawler noted that Buggs was an "awful
large man," who was "high on coke, crack or ecstasy and
intoxicated," and suggested that maybe Petitioner was acting in
self-defense. Petitioner said that he loved Robertson and again
asked to see her. Lawler remarked that Petitioner seemed "troubled,
maybe torn, conflicted," and suggested that "[p]art of him might
want to tell us what happened to save Lashunda from going to jail."
Petitioner responded, "my mind won't let me tell what happened."
Petitioner did not admit that he called Robertson's phone that
evening, but he did admit that his cell phone number was
718-764-9645.

At about 3:40 a.m., Lawler left the interview room and
returned five minutes later with Robertson; he allowed Petitioner
to hug her before escorting her out of the room. After Robertson
left the room, Petitioner told Lawler that he has blackouts when he
is under stress. Lawler asked Petitioner if it was possible that he
shot Buggs while suffering from a blackout. Petitioner said he
could not remember. Petitioner asked to spend some time with

Robertson. Lawler left Petitioner alone in the room for two minutes.

When he reentered the room, Lawler asked Petitioner what was important in his life. Petitioner said that he loved his dog, whom he had raised from the time he was a sick puppy. Petitioner had nursed him back to health and was now concerned for his dog's safety because Animal Control had taken custody of the dog when the police searched his house. Petitioner began to cry.

Lawler then left the room and allowed Robertson to come in to see Petitioner. They were alone together for two minutes before Lawler re-entered the room. About five minutes later, Petitioner apologized, said the officers were nice people, but he wanted to go to booking. Lawler ended the interview at 4:25 a.m.

On direct appeal, the Appellate Division adjudicated this claim on the merits. The court noted that "although threats by the police to arrest a person's loved ones may result in suppression, '[i]t is not an improper tactic for police to capitalize on a defendant's sense of shame or reluctance to involve his [loved ones] in a pending investigation absent circumstances [that] create a substantial risk that a defendant might falsely incriminate himself [or herself][.]'" People v. Lewis, 93 A.D.3d at 1265–66 (internal and other quotations omitted; some alterations in original). In Petitioner's case, the Appellate Division found "no evidence 'that the police promised not to arrest [Petitioner]'s

girlfriend if [Petitioner] talked . . . , and there were no other circumstances creating a substantial risk that [Petitioner] would falsely incriminate himself[.]'" Id. (internal quotation and quotation marks omitted in original). The Court finds that this holding correctly applied Federal law.

The Supreme Court has not squarely addressed whether threats to charge third-parties amount to coercion; nor has the Second Circuit. Several other circuit courts and district courts within the Second Circuit have held that "such a threat does not render a confession involuntary if the police have probable cause to arrest the family member and thus could lawfully carry out the threat." United States v. Ortiz, 943 F. Supp.2d 447, 456-57 (S.D.N.Y. 2013); see also United States v. Miller, 450 F.3d 270, 272 (7th Cir. 2006) ("An objectively unwarranted threat to arrest or hold a suspect's paramour, spouse, or relative without probable cause could be the sort of overbearing conduct that society discourages by excluding the resultant statements.") (citation omitted), abrogated on other grounds by Kimbrough v. United States, 552 U.S. 85 (2007); United States v. Johnson, 351 F.3d 254, 263 (6th Cir. 2003); Thompson v. Haley, 255 F.3d 1292, 1296-97 (11th Cir. 2001); Allen v. McCotter, 804 F.2d 1362, 1364 (5th Cir. 1986); United States v. Serrano, 937 F. Supp.2d 366, 376 (E.D.N.Y. 2013); United States v. Ortiz, 499 F. Supp.2d 224, 232-33 (E.D.N.Y. 2007).

Here, as the suppression court found, there was no proof that Robertson was <u>not</u> legitimately subject to being charged in connection with Buggs' murder as an accomplice. Indeed, the police were aware that Robertson had summoned Petitioner to come to her house to deal with Buggs, who had been harassing her by trying to kiss her and stealing her "weed." Furthermore, the record shows that Lawler's suggestion that Petitioner might want to tell the police what happened to spare Robertson from jail did not have the effect of overbearing Petitioner's will to resist or bringing about a confession that was not freely given. <u>See</u> <u>Oregon v. Elstad</u>, 470 U.S. 298, 304 (1985) (holding that a confession is involuntary, and inadmissible, if obtained by "techniques and methods offensive to due process, . . . or under circumstances in which the suspect clearly had no  opportunity to exercise a free and unconstrained will"). To the contrary, Petitioner remained resolute in his decision not to implicate himself in Buggs's murder. After being permitted to meet with Robertson, Petitioner terminated his interview with Lawler without having offered any information about the shooting. Accordingly, even assuming that Lawler's comment was perceived by Petitioner as a threat to arrest Robertson if he did not provide information about the murder, there is no evidence that this tactic actually resulted in a confession, much less one that was involuntary.

**B.   Ground Two: Failure to Suppress Unduly Suggestive Identification Evidence**

Petitioner argues, as he did on direct appeal, that it was unduly suggestive for the police to present the witness with two photo arrays in which his photograph was the only one that was repeatedly used.

The Appellate Division disposed of this claim on the merits, noting that "[m]ultiple photo identification procedures are not inherently suggestive[.]" Lewis, 93 A.D.3d at 1266 (quotation marks and quotation omitted). Although Petitioner's photograph appeared in the same sequence in each photo array, a practice which the Appellate Division found should not be encouraged, that court concluded there was nothing unduly suggestive about the photo arrays. Id. at 1266-67 (citations omitted). The Court finds that this holding correctly applied Federal law.

The Supreme Court has clearly held that "convictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." Simmons v. United States, 390 U.S. 377, 384 (1968); accord Stovall v. Denno, 388 U.S. 293, 301-02 (1967). In Simmons, the defendant was charged with committing an armed robbery of a savings and loan institution that occurred in front of five witnesses who were employees of the institution. 390

U.S. at 380-81. One day after the robbery, each of the witnesses was shown a series of at least six photographs, with the defendant and another man "each appearing several times in the series." Id. at 385. Each witness identified the defendant, and none identified the other man whose photograph recurred in the series, "who apparently was as prominent in the photographs as Simmons." Id. As has Petitioner here, the defendant in Simmons argued "that in the circumstances the [pretrial] identification procedure was so unduly prejudicial as fatally to taint his conviction." Id. at 383.

The Supreme Court rejected a blanket exclusionary rule in Simmons, instead finding that the Due Process clause required courts to consider each case "on its own facts[.]" Id. at 384; see also Perry v. New Hampshire, 565 U.S. 228, 239 (2012) ("[T]he Due Process Clause requires courts to assess, on a case-by-case basis, whether improper police conduct created a 'substantial likelihood of misidentification.'") (quoting Neil v. Biggers, 409 U.S. 188, 209 (1972); citation omitted).

Here, the Appellate Division correctly applied the Supreme Court's "totality of the circumstances" approach. As an initial matter, Federal courts have found that "[a] suspect's inclusion in two photospreads, even with the same photo, is not constitutionally impermissible." United States v. Maguire, 918 F.2d 254, 263 (1st Cir. 1990) (citing Perron v. Perrin, 742 F.2d 669, 675 (1st Cir. 1984); United States v. Eatherton, 519 F.2d 603, 608 (1st Cir.),

cert. denied, 423 U.S. 987 (1975)). As the Appellate Division noted, different photographs of Petitioner were used in each presentation to the witness; the first array contained a photograph of Petitioner that was taken a year prior to the crime, while the second array contained a photograph of Petitioner taken soon after the crime. See Stewart v. Duckworth, 93 F.3d 262, 266 (7th Cir. 1996) (witness shown two photo arrays, the latter of which contained a recent photo of the defendant while the first array contained an older photo; witness made identification after viewing second array; court noted it "would be a different matter had [the witness] been shown the recent photos twice before making an identification").

The Appellate Division also found a basis in the record for explaining the witness's failure to identify anyone from the first array—the witness's fear for the safety of her family. The record reflects that the witness voiced those concerns to the detective during the first photo array procedure. It was only after the police assured her that her family would be relocated that the witness made a positive identification of Petitioner during the second photo array procedure. Finally, the state court found that Petitioner's face did not stand out among the photos selected for either of the arrays. This Court's independent review of the photos supports this finding.

Moreover, there was ample reason to conclude that, notwithstanding the photo array procedures, Lewis had an independent basis to make a reliable identification of petitioner in court. See Neil v. Biggers, 409 U.S. at 199-200 (an in-court identification may still be admissible if "under the totality of the circumstances the identification was reliable even though the confrontation procedure was suggestive"). The witness testified that she had been well-acquainted with Petitioner before the shooting, and knew him by his nickname, "Deuce." She had met him through her friendship with his girlfriend, Robertson. The three of them had talked casually in a group earlier that summer. The witness immediately recognized him when he appeared at the stoop just before Buggs was shot. After the shooting was over, Petitioner warned her in the hallway of her apartment building that she should not tell anyone what she saw. A month later, Petitioner approached her and thanked her for not reporting him to the police. In light of the witness's multiple interactions with Petitioner before and after the shooting, she had a sufficient independent basis to identify Petitioner in court even without regard to the photo array procedures.

### C.    Ground Three: Failure of the Prosecution to Comply With Disclosure Obligations

Petitioner argues, as he did in his pro se supplemental brief, that the prosecution failed to comply with their discovery obligations under People v. Rosario, N.Y.2d 286 (1961), by not

disclosing to the defense Buggs's identification of Petitioner to the police. The testimony at issue concerns Buggs's statement to RPD Officer Brochu that the person who shot him was a black male with braids and lived in the area of Dewey and Pierpont. The prosecutor was permitted to introduce this statement at trial under the excited utterance and dying declaration exceptions to the rule against hearsay.

As a matter of New York State statutory and decisional law, a prosecutor must disclose to the defense any statement of a witness whom the prosecutor intends to call at a hearing or trial, whose statement is in the prosecutor's possession or control, and which relates to the subject matter of the witness's testimony. <u>Rosario</u>, 9 N.Y.2d at 289; N.Y. CRIM. PROC. L. §§ 240.44(1), 240.45(1)(a). Courts in this Circuit repeatedly have held that the prosecution's disclosure obligations under <u>Rosario</u>, <u>supra</u>, as well as any sanctions to which the defense may be entitled as a result of the prosecution's violation of such obligations, are matters of New York State law and do not implicate Federal constitutional principles. <u>See</u> <u>Martinez v. Walker</u>, 380 F. Supp.2d 179, 186 & n. 5 (W.D.N.Y. 2005) ("To the extent that <u>Rosario</u> exceeds federal constitutional requirements, it defines state law, and the prosecutor's failure to turn over <u>Rosario</u> material is not cognizable on federal habeas review.") (citing <u>Lyon v. Senkowski</u>, 109 F. Supp.2d 125, 139 (W.D.N.Y. 2000); <u>Green v. Artuz</u>, 990

F. Supp. 267, 274 (S.D.N.Y. 1998) (citing <u>United States ex. rel.</u> <u>Butler v. Schubin</u>, 376 F. Supp. 1241, 1247 (S.D.N.Y. 1974), <u>aff'd</u>, 508 F.2d 837 (2d Cir. 1975)); <u>Copes v. Schriver</u>, No. 97 CIV. 2284 (JGK), 1997 WL 659096, at *4 (S.D.N.Y. Oct. 22, 1997) ("Th[e] [<u>Rosario</u>] rule . . . is grounded in state law and a violation of the rule would not establish a constitutional violation or entitle the petitioner to relief on a petition for habeas corpus.").

Moreover, Petitioner does not have a colorable argument that, given the evidence at issue, the prosecutor violated any requirements of <u>Brady v. Maryland</u>, 373 U.S. 83 (1963), and its progeny. In <u>Brady</u>, the Supreme Court held that "the suppression by the prosecution of evidence <u>favorable</u> to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87 (emphasis supplied). Here, Buggs's statement to Officer Brochu was neither exculpatory nor impeaching, and thus was not favorable to Petitioner. Therefore, the prosecution's failure to provide it to the defense did not implicate Petitioner's due process rights under <u>Brady</u>, 373 U.S. 83, <u>supra</u>, and no constitutional violation occurred.

   **D.   Grounds Four and Six: Denial of Right to Testify Before Grand Jury and Prosecution's Waiver of Petitioner's Right to Preliminary Hearing**

Petitioner reasserts his claims, first raised in his <u>pro</u> <u>se</u> supplemental appellate brief, that he was denied both his right to

a preliminary hearing and his right to testify before the grand jury.

Under New York law, Petitioner may have had a statutory right to a preliminary hearing if no indictment issued within five days of his arrest. See N.Y. CRIM. PROC. LAW §§ 180. 10; 180. 60. This right is not of a Federal constitutional dimension, however. See Strong v. Mance, No. 9:07-CV-0878-NAM-GHL, 2010 WL 1633398, at *7 (N.D.N.Y. Apr.2, 2010) ("[T]here is no federal constitutional right to a preliminary hearing.") (citing, inter alia, Gerstein v. Pugh, 420 U.S. 103, 118-19 (1975) ("[W]e adhere to the [this] Court's prior holding that a judicial hearing is not prerequisite to prosecution by information.") (citing Beck v. Washington, 369 U.S. 541, 545 (1962)). Thus, Petitioner's preliminary hearing claim must be dismissed as not cognizable on federal habeas review. E.g., Caswell v. Racetti, No. 11-CV-0153 MAT, 2012 WL 1029457, at *5 (W.D.N.Y. Mar. 26, 2012) (dismissing, as not cognizable, in a § 2254 petition, a claim based on the denial of a preliminary hearing); John v. People, No. 91 CIV. 7634, 1992 WL 261282, at *1 (S.D.N.Y. Sept. 29, 1992) ("The habeas petition is denied, because there is no federal constitutional requirement for a preliminary hearing as a prerequisite to a valid conviction at trial.").

Petitioner's claim that errors occurred during the grand jury proceeding likewise is not cognizable on habeas review. Caswell, 2012 WL 1029457, at *5. In New York State, a defendant's right to

testify before the grand jury is statutorily-created. <u>Id.</u> (citing
N.Y. CRIM. PROC. LAW § 190.50(5)). "Furthermore, there is no federal
constitutional right to indictment by a grand jury in a state
criminal prosecution." <u>Id.</u> (citing <u>Alexander v. Louisiana</u>, 405 U.S.
625, 633 (1972) ("Although the Due Process Clause guarantees
petitioner a fair trial, it does not require the States to observe
the Fifth Amendment's provision for presentment or indictment by a
grand jury."); <u>LanFranco v. Murray</u>, 313 F.3d 112, 118 (2d Cir.
2002) (noting that the Fifth Amendment's right to indictment by
grand jury has not been incorporated against the states through the
Fourteenth Amendment)). It is therefore "beyond question that 'the
right to testify before a grand jury is purely a New York state
statutory right, and is not a constitutional right that can lead to
relief on habeas review.'" <u>Caswell</u>, 2012 WL 1029457, at *5 (quoting
<u>Byrd v. Demarco</u>, No. 11-CV-0750-JS, 2011 WL 809657, at *1 (E.D.N.Y.
Feb. 25, 2011) (internal quotation and citations omitted)
(collecting cases); <u>Lucius v. Filion</u>, 431 F. Supp.2d 343, 346
(W.D.N.Y. 2006)).

Any possible defect in the grand jury proceeding, including
the absence of Petitioner's testimony, was cured by Petitioner's
conviction at trial. <u>See</u> <u>Lopez v. Riley</u>, 865 F.2d 30, 32 (2d Cir.
1989) (stating that "if federal grand jury rights are not
cognizable on direct appeal when rendered harmless by a petit jury,
similar claims concerning a state grand jury proceeding are <u>a</u>

*fortiori* foreclosed in a collateral attack brought in a federal court") (citing <u>United States v. Mechanik</u>, 475 U.S. 66, 70 (1986) (subsequent guilty verdict by <u>petit jury</u> renders any error in the grand jury proceeding harmless beyond a reasonable doubt)); <u>Velez v. People of the State of New York</u>, 941 F. Supp. 300, 315 (E.D.N.Y. 1996) (claim that petitioner was denied his right to testify before the grand jury was cured by his conviction at trial).

### E.    Ground Five: Excessive and Vindictive Sentence

Petitioner reprises his claims, raised on direct appeal, that (1) his sentence is harsh and excessive; and (2) the trial judge sentenced him vindictively for exercising his right to go to trial. The Appellate Division rejected these claims, finding that the record showed no retaliation or vindictiveness against Petitioner for electing to proceed to trial. Exercising its statutorily-granted factual review power, the Appellate Division also concluded that the sentence was not unduly harsh or severe. <u>Lewis</u>, 93 A.D.3d at 1267.

### 1.    Harsh and Excessive Sentence

It is well settled that an excessive sentence claim may not be raised as grounds for habeas corpus relief if the sentence is within the range prescribed by state law. <u>White v. Keane</u>, 969 F.2d 1381, 1383 (2d Cir. 1992) (<u>per curiam</u>) ("No federal constitutional issue is presented where the sentence is within the range prescribed by state law.") (citing <u>Underwood v. Kelly</u>, 692

F. Supp. 146 (E.D.N.Y. 1988), aff'd mem., 875 F.2d 857 (2d Cir. 1989)).

With regard to the Buggs incident, Petitioner was convicted of second-degree murder, second-degree criminal possession of a weapon, and third-degree criminal possession of a weapon. For each conviction, he was sentenced to the maximum prison term permissible under New York law. See N.Y. PENAL LAW §§ 125.25(1), 265.03(1)(b), 265.02(4), 70.00(2)(a), (2)(d), (3)(a)(i), (3)(b), 70.02(1)(b), (3)(b). With regard to the Durden incident, Petitioner was convicted of attempted second-degree murder, two counts of first-degree robbery, two counts of first-degree assault, two counts of first-degree burglary, one count of second-degree criminal possession of a weapon, and one count of third-degree criminal possession of a weapon. For each conviction except one, Petitioner was sentenced to the maximum term allowable by statute. See N.Y. PENAL LAW §§ 110.00/125.25(1), 265.03(1)(b), 265.02(4), 160.15(1), (2)), §§ 120.10(1), (4), 140.30(1), (2), 265.03(1)(b), 265.02(4), 70.02(1)(a), (1)(b), (3)(a), 70.00(2)(a), (2)(d), (3)(a)(i), (3)(b). For one of his burglary convictions, Petitioner was sentenced to one term of 15 years, which was 10 years less than the maximum allowable term. Because the burglary represented an act separate from the attempted murder of Durden, and the crimes against Durden were separate acts from those committed against Buggs, the trial court was entitled to impose consecutive

-21-

sentences. Cf. N.Y. PENAL LAW § 70.25(2) ("When one or more sentence of imprisonment is imposed on a person for two or more offenses committed through a single act or omission which in itself constituted one of the offenses and also was a material element of the other, the sentences . . . must run concurrently.") (emphasis supplied). Accordingly, as Respondent argues, Petitioner's prison sentence was within the limits established by New York's sentencing statute. The fact that Petitioner received the maximum terms possible does not make his sentence harsh and excessive. E.g., Mungo v. Duncan, 277 F. Supp.2d 176, 185 (E.D.N.Y. 2003) (dismissing challenge to sentence as not cognizable where petitioner's "sentence of twenty-five years to life, although the maximum allowable under state law, fell within the permitted statutory range"), aff'd, 393 F.3d 327 (2d Cir. 2004).

## 2. Vindictive Sentencing

In North Carolina v. Pearce, 395 U.S. 711 (1969), addressing the issue of vindictive resentencing, the Supreme Court held that the Due Process clause limits a state's authority to impose a harsher sentence on a defendant who has been reconvicted after a new trial for the same offense. Id. at 724-26. However, a presumption of vindictiveness applies to a sentence only when there is a "realistic motive for [the] vindictive sentencing." Texas v. McCullough, 475 U.S. 134, 139 (1986). When a presumption of vindictiveness does not apply, the petitioner has the burden of

proving vindictiveness by a preponderance of the evidence. <u>Alabama v. Smith</u>, 490 U.S. 794, 799–800 (1989). The Supreme Court has acknowledged, however, that "not every burden on the exercise of a constitutional right, and not every pressure or encouragement to waive such a right is invalid." <u>Corbitt v. New Jersey</u>, 439 U.S. 212, 219 (1978). Indeed, the Supreme Court has "squarely held that a State may encourage a guilty plea by offering substantial benefits in return for the plea. . . ." <u>Id.</u>

Here, the prosecution had offered Petitioner the opportunity to plead guilty to the murder count and the attempted murder count and receive an aggregate prison term of 25 years to life, and Petitioner was informed that if he did not accept the plea, he could face consecutive sentences on the convictions related to separate each event. Although Petitioner initially accepted the plea offer, he subsequently was permitted to withdraw his plea.

Petitioner has offered no evidence apart from the discrepancy between the sentence promise offered as part of the plea bargain and the sentence he actually received. The record is clear that Petitioner withdrew his plea and proceeded to trial with full knowledge that he potentially faced a much sentence if the jury convicted him. The disparity in the sentences offered and imposed does not make out a claim of actual vindictiveness, because the trial judge never suggested that the sentence was based on Petitioner's refusal of the plea offer. The mere fact that,

following conviction, the trial judge imposed the maximum term possible as to each of the individual sentences and ordered them to run consecutively does not, in and of itself, demonstrate actual vindictiveness. E.g., Pabon v. Hake, 763 F. Supp. 1189, 1194-95 (E.D.N.Y. 1991) ("The only evidence the Petitioner cites in support of his claim of vindictive sentencing was that, after trial, he received a sentence exceeding the promised sentence he rejected as part of the proposed plea agreement. . . . The fact that an offered sentence during plea negotiation is less than the maximum potential sentence does not mean that the judge acted vindictively[.]") (citing Shu v. Wilmot, No. 84 Civ. 5359-CSH, 1985 WL 2034, at *3 (S.D.N.Y. July 15, 1985) ("[T]here is no reason to presume solely from the fact of a disparity between a sentence offered as part of a rejected plea bargain and the sentence imposed after trial by a second judge that vindictiveness played a role in sentencing. Some other evidence . . . must be presented to demonstrate the possibility of an improper motive."). On the present record, Petitioner has not established by a preponderance of the evidence that an unconstitutional retributory motive informed the judge's sentencing decision.

**F.  Grounds Seven, Eight, Nine, Ten and Eleven: Ineffective Assistance of Trial Counsel**

Petitioner reasserts his claims, first raised in his C.P.L. § 440.10 motion, that the attorney who represented him during both of his trials was ineffective. Specifically, Petitioner complains

-24-

that trial counsel failed to (1) present the testimony of forensic expert Gary Skuse ("Skuse"), whom trial counsel had retained and who had discovered alleged discrepancies in the prosecution's DNA evidence; (2) retrieve the duplicate buccal swab for independent DNA testing; (3) call an expert in victim identification testimony to cast doubt on Durden's identification; (4) present an alibi defense at his trial for Buggs's murder after informing the jury during opening statements that he would present an alibi defense; and (5) offer into evidence Robertson's recantation statement. In denying <u>vacatur</u> of the conviction, the Monroe County Supreme Court (Sinclair, J.) ("the C.P.L. § 440.10 court") held that, except for his claims concerning the failure to call Skuse as an expert witness and obtaining a buccal swab for testing, the ineffective of trial counsel claims were barred from review because they were based on matters on the record and could have been raised on direct appeal. <u>See</u> N.Y. CRIM. PROC. LAW § 440.10(2)(c).

Respondent argues that the claims which were denied on the basis of C.P.L. § 440.10(2)(c) are procedurally barred pursuant to the adequate and independent state ground doctrine. Because these claims of ineffective assistance are easily resolved on the merits, the Court declines to address the issue of procedural default raised by Respondent as an affirmative defense.

### 1.    Standard of Review

The Sixth Amendment provides that in all criminal prosecutions, the accused shall enjoy the right to the assistance of counsel. U.S. CONST., amend. VI. In order for a habeas petitioner to establish that he received the ineffective assistance of trial counsel, he must show both that his attorney provided objectively deficient representation and that he suffered prejudice as a result of that deficient performance. Strickland v. Washington, 466 U.S. 668, 687 (1984).

To establish deficient representation, the petitioner must show that "counsel's representation fell below an objective standard of reasonableness," and that counsel's conduct "so undermined the proper functioning of the adversarial process" that the process "cannot be relied on as having produced a just result." Id. at 686, 688. A court reviewing an ineffective assistance of counsel claim is required to "indulge a strong presumption that counsel's conduct [fell] within the wide range of reasonable professional assistance." Id. at 689.

Because "[a]ttorney errors come in an infinite variety and are as likely to be utterly harmless in a particular case as they are to be prejudicial," the petitioner must also "affirmatively prove prejudice." Id. at 693. To meet this burden, the petitioner must to show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would

have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." <u>Id.</u> at 694. It is not enough for the petitioner to show that the errors had "some conceivable effect" on the outcome of the trial. <u>Id.</u> at 693. Rather, the petitioner must establish that his attorney's errors were "so serious as to deprive [him] of a fair trial, a trial whose result is reliable." <u>Id.</u> at 687.

### 2. Trial Counsel's Alleged Errors

#### a. Failure to Call Expert in DNA Evidence

In support of his argument that trial counsel erred in failing to call Skuse to testify on his behalf, Petitioner points to a letter from Skuse to trial counsel dated November 20, 2008, wherein Skuse detailed some questions and inconsistencies he noticed in the prosecution's DNA report. Petitioner argues that, in light of these inconsistencies and questions, trial counsel was ineffective for not calling Skuse.

In the letter produced by Petitioner, Skuse began by stating that he had received "the additional laboratory notes related to <u>People v. Lewis</u>" in which he "found some interesting points, but, overall, <u>nothing that changed </u>the conclusions communicated in [his] letter of 9 September[.]" SR.682 (quotation omitted; emphasis supplied by C.P.L. § 440.10 court). Skuse then went on to explain the opinions he had offered in the September 9th letter, and that the tendering of the "additional laboratory notes" had helped to

explain the inconsistencies described therein. As the C.P.L. § 440.10 court found, "given the context of Skuse's letter and his reference to it, the implications are clear: Skuse's testimony may have allowed trial counsel to point to some inconsistencies of the prosecution's testing, but that his ultimate conclusion would not have been favorable to the defendant." SR.682. The C.P.L. § 440.10 court reasonably concluded that trial counsel therefore "clearly had a strategic explanation in not calling Skuse." (Id.) (citation omitted). Furthermore, in light of Skuse's adherence to his original conclusion, which was not favorable to the defense, Petitioner cannot show a reasonable probability of a more favorable result had trial counsel put Skuse on the stand.

### b. Failure to Test Duplicate Buccal Swab

The C.P.L. § 440.10 court also reasonably rejected Petitioner's claim that trial counsel was ineffective for failing to obtain one of the two buccal swabs taken of Petitioner in order to conduct independent DNA testing. The C.P.L. § 440.10 court reasoned that that trial counsel was not ineffective for failing to obtain the duplicate swab given that Skuse, the expert retained by the defense, did not seek to conduct independent DNA testing. Morever, Petitioner can hardly complain of being prejudiced by trial counsel's failure to retrieve the buccal swab that was in the prosecution's possession, since the swab contained Petitioner's own DNA material. Thus, had the defense expert found it necessary to

conduct independent testing, he easily could have obtained additional DNA material from Petitioner. Furthermore, Petitioner has offered no reason to conclude that independent testing on the duplicate swab would have yielded different results or otherwise would have been favorable to the defense.

### c. Failure to Call Expert in Eyewitness Identification

Petitioner next argues that trial counsel was ineffective for failing to call an expert in eyewitness identification testimony to undermine the validity of Durden's identification. Petitioner notes that trial counsel argued that trauma can cause result in misidentification. Therefore, he concludes, trial counsel should have presented an expert witness to flesh out that theory for the jury. The Court finds that Petitioner has failed to demonstrate a reasonable probability that calling such expert would have affected the outcome, in light of the other substantial and convincing evidence identifying him as the gunman who shot Durden. In particular, Petitioner's accomplice, Singleton, testified about how he enlisted Petitioner to help him rob Durden of marijuana and money. Singleton explained that during the crime, Petitioner kept a gun trained on Durden while Singleton went to her bedroom and stole items of her property. Singleton also testified that the shirt and cap worn by Petitioner during the crime, and the binder Petitioner used as a prop, ended up in the backyard of one of Durden's nearby neighbors. Testing performed on these items

revealed traces of Petitioner's blood and Durden's saliva on the shirt and Petitioner's blood on the binder. Petitioner's claim that the verdict would have been altered favorably by expert witness testimony on the effect of trauma on witness identification is purely speculative.

### d.    Failure to Present Alibi Defense

In his proffer to the trial court regarding two potential alibi witnesses and a corroboration witness, defense counsel explained that the first alibi witness, Petitioner's sister, would testify that she was

> present with him at around 11:00 p.m., 11:30 p.m. on August 17[, 2006,] and that she had conversations with him in the basement and that the defendant indicated to her that he was having trouble with a person by the name of Kevin Rowe, that he had had a fight during the day, a dispute with Kevin Rowe, and Mr. Robinson apparently was going to corroborate that account. The alibi witness would testify that she had talked Mr. Lewis out of doing anything rash and that he had decided to go to his residence and watch movies, where they remained throughout the evening, early evening hours of August 18 until the next morning at the time of the alleged crime.

Trial Transcript ("Tr.") 680 (ECF #31-6). Defense counsel then noted that "Robinson would be a corroboration witness" for Petitioner's sister, since "[h]e observed the fight or altercation between Mr. Lewis and Mr. Rowe that day" and "can testify to his observations of what occurred out on Dewey Avenue between the person Kevin Rowe and Kevin Lewis." Tr. 680-81. Finally, the third witness mentioned by defense counsel was a friend of Petitioner's sister named Nancy Tran, who was with Petitioner's sister at their

mother's house and "did go with them to [Petitioner's] residence around 11:30, approximately, on August 17, and remained with them at his residence throughout the night. . . ." Tr. 681.

The trial judge questioned the wisdom of presenting testimony to the jury that Petitioner, "at or about the same time as the alleged murder, was racking a shotgun in the dispute with someone else[.]" Tr. 682. He noted that such testimony did not seem to be a necessary part of the alibi evidence, and, "quite frankly, . . . it would seem to be so prejudicial to the defendant that it might not be a good thing to present." Id. The trial judge also questioned whether or not the proposed alibi testimony was relevant to the time-frame at issue. After a recess to consider the arguments, the trial judge ruled that the proposed testimony "would be outside of traditional alibi testimony regarding a place and time and location," which he "would find not relevant," and "so [he] would deny any request to present that to the jury in the context of alibi testimony." Tr. 683-84.

Defense counsel then stated that, after discussing the matter of alibi testimony with Petitioner and his family members, they decided not to proceed with that defense "given the prejudicial impact to the jury of certain testimony of what was [Petitioner] doing." Tr. 684. The trial judge asked defense counsel if he had discussed with Petitioner the possibility that he might not allow some of those matters to be presented, and if they had determined

not to present an alibi defense. Defense counsel confirmed that the judge's understanding was correct. The trial judge then addressed Petitioner directly, asking if that was correct, and Petitioner answered affirmatively. Tr. 684. Petitioner also answered yes when the judge asked him if he had discussed the issue with his attorney and his family. Tr. 685.

After reviewing the record, the Court finds that Petitioner's claim that trial counsel was ineffective in failing to present alibi testimony is meritless. First, as detailed above, trial counsel did seek to present two alibi witnesses and one corroborating witness, but the trial judge declined that request on the basis that their testimony concerned an irrelevant time-period. Second, even assuming that the trial judge had permitted the proposed testimony to come in within the context of an alibi defense, counsel had a legitimate strategic reason for declining to do offer it—namely, the potential for significant prejudice to Petitioner if the jury heard that he routinely dealt with agreements by employing a deadly weapon. Petitioner, moreover, was aware of counsel's strategic reason, and he stated his agreement with that decision on the record.

### e. Failure to Introduce Witness's Recantation

Petitioner faults trial counsel for failing to introduce the recantation statement of Robertson, his paramour, into evidence. At trial, on cross-examination, Robertson testified that on October 7,

2006, she told the police that Buggs, the murder victim, had pushed Petitioner and started to punch him. She testified that she had lied to the police because she wanted to make it seem as though Petitioner shot Buggs in self-defense. Tr. 489-90 (ECF #36-1). Robertson claimed that she also lied when a police officer came to her apartment asking questions about the shooting; she falsely related that she had been inside her apartment and so did not hear any gunshots. Tr. 490-91. Robertson also admitted on cross-examination that she had prepared a letter retracting an earlier statement that she had provided to the police. She had sent the retraction to the District Attorney's Office, the trial judge and trial counsel, explaining that she felt pressured into making the written statement to the police and that the contents of that statement were false. She stated that it was not true that Petitioner shot Buggs. Tr. 494-95. Robertson testified that the retraction was a lie and that she had hoped her retraction would lead to the charges against Petitioner being dropped. Tr. 495. Robertson testified that Petitioner's mother, Phyllis Heard ("Heard"), prompted her to write the recantation letter, which was prepared by Heard's friend and was on Heard's computer. When Robertson arrived at Heard's house, she just needed to fill in certain portions of the recantation letter. Heard then brought Robertson to a bank to get the letter notarized. Tr. 501-03. On re-cross examination, trial counsel attempted to admit the document

into evidence, but the trial court sustained the prosecutor's objection to its admission. Tr. 506.

This claim is factually baseless because, as detailed above, trial counsel did attempt to introduce the recantation letter into evidence. However, the trial judge sustained the prosecution's objection to it. It is legally baseless because even assuming that trial counsel had not attempted to introduce the letter itself, trial counsel effectively placed the substance of it before the jury during Robertson's cross-examination. Therefore, the Court cannot find that Petitioner was prejudiced.

## IV. Conclusion

For the foregoing reasons, the amended petition for a writ of habeas corpus is denied. The Court declines to issue a certificate of appealability because Petitioner has failed to make a substantial showing of the denial of a constitutional right. See 28 U.S.C. § 2253(c)(2).

**SO ORDERED.**

S/Michael A. Telesca

_____
HONORABLE MICHAEL A. TELESCA
United States District Judge

DATED:     August 10, 2018
           Rochester, New York